UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SELECT SPECIALTY HOSPITAL - SIOUX FALLS, INC., a Missouri business corporation, | 4:19-CV-04171-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART BRENTWOOD'S AND THE FUND'S MOTION FOR SUMMARY JUDGMENT, GRANTING DAKOTACARE'S MOTION FOR SUMMARY JUDGMENT, AND DENYING SELECT SPECIALTY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| BRENTWOOD HUTTERIAN, BRETHREN, INC., a South Dakota non-profit corporation; SOUTH DAKOTA MEDICAL HOLDING COMPANY, INC., a South Dakota Corporation, d/b/a Dakotacare; HUTTERIAN BRETHREN GENERAL MEDICAL FUND, a South Dakota non-profit corporation; | |
| Defendants. | |
| SOUTH DAKOTA MEDICAL HOLDING COMPANY, INC., a South Dakota corporation, d/b/a Dakotacare, | |
| Cross-Claimant, | |
| vs. | |
| HUTTERIAN BRETHREN GENERAL MEDICAL FUND, a South Dakota non-profit corporation, | |
| Cross-Defendant. | |

Plaintiff, Select Specialty Hospital, filed an amended complaint against

the defendants — Brentwood Hutterian Brethren, Inc. (Brentwood), Hutterian

Brethren General Medical Fund (the Fund), and South Dakota Medical Holding

Company, Inc. (Dakotacare) — alleging breach of contract, unjust enrichment, and civil conspiracy. Docket 25 at 6, 10. Select Specialty also brings claims against Brentwood and the Fund for quantum meruit and for fraud and deceit and against Dakotacare for negligence. *Id.* at 7-8. Select Specialty also seeks declaratory relief. *Id.* at 11-13. Dakotacare cross-claims against the Fund seeking indemnification. Docket 31. The defendants each move for summary judgment as to all claims. Dockets 35, 40. Select Specialty opposes defendants' motions, and moves for partial summary judgment as to its breach of contract claim against the Fund. Dockets 44, 54, 61.

## FACTUAL BACKGROUND

This dispute arises out of treatment Select Specialty provided to Mary, a member of the Brentwood Hutterite Colony, during four periods between March 14, 2018, and December 10, 2018. Docket 56 ¶¶ 1, 31-32. The Fund is a consortium of Hutterite Colonies, including Brentwood, that established the self-funded Hutterian Brethren General Medical Plan to provide medical coverage to Hutterite Colony members. *Id.* ¶¶ 1-2. Jared Wollman is Brentwood's Secretary/Treasurer and a director of the Fund, and he was authorized to act on behalf of the Fund. Docket 53 ¶ 10. At all times that Select Specialty provided care to Mary in 2018, she was covered by the Plan. Docket 56 ¶ 30. The Fund contracted with Dakotacare to administer the Plan. Docket 60 ¶ 5. Dakotacare had a Participation Agreement with Select Specialty. Docket 63-3. Before Select Specialty provided care to Mary, it obtained preauthorization from Dakotacare for those services. Docket 56 ¶ 33.

Mary's medical team determined that she would need to be transferred to another facility where she could be on a ventilator for continued rehabilitation. *Id.* ¶ 38. One such facility is located at Avera Prince of Peace, but that facility only serves patients eligible for South Dakota Medicaid. Docket 63-4 at 2. In April 2018, Karilynn Berndt, a Select Specialty employee, assisted Wollman and Mary's family in attempting to obtain Medicaid coverage for Mary through a Long-Term Care Benefits application. Docket 60 ¶ 29; *see* Docket 43-1 at 4-6. Berndt completed part of this application, and then connected Wollman and Mary's family to MedData, a third-party vendor, who assisted in the completion and submission of the application. Docket 60 ¶ 29. The South Dakota Department of Social Services denied this application, effective April 18, 2018. Docket 49-5 at 1. The denial notice stated that "[i]f approved for SSI [Supplemental Security Income], you will be eligible for SD Medicaid." *Id.*

On April 27, 2018, Wollman and Mary's daughter, Lorraine, applied for SSI disability benefits on Mary's behalf. Docket 56 ¶¶ 51-52. In a letter dated May 22, 2018, Social Services informed Lorraine that Mary's application for SSI benefits was approved, effective May 1, 2018, and that due to Mary's SSI eligibility, Mary was automatically eligible for Medicaid and may qualify for retroactive Medicaid coverage. Docket 47-6 at 1. In his deposition, Wollman stated that at the time this letter was received, he did not understand what retroactive eligibility meant, but that it was explained to him by Mary's primary care providers in October 2018. Docket 43-2 at 6-7.

On October 10, 2018, Wollman emailed Dakotacare requesting that Mary's coverage through the Plan be retroactively terminated, effective April 30, 2018, which coincided with Mary's Medicaid start date. Docket 37-19; *see* Docket 47-6 at 1. Five days later, Dakotacare received the first claim from Select Specialty seeking reimbursement for Mary's care. Docket 60 ¶ 38. The next day, Wollman informed Select Specialty that he was "working on terminating Mary" from her Plan coverage, and that he "was trying to determine her cancelation date to figure out where Medicaid will take over." Docket 37-21. Christine Thompson of Dakotacare emailed Wollman twice in November 2018 inquiring about Mary's termination date, noting in one email that Select Specialty had contacted Dakotacare about a payment timeframe for the more than $1.6 million in billed charges. Docket 48-4 at 1-2. Wollman responded to both emails, indicating that he was still waiting for a final decision from Medicaid. *Id.* at 1-2.

On November 27, 2018, Social Services notified Wollman that Mary's application for retroactive Medicaid eligibility was approved, effective March 1, 2018. Docket 56 ¶ 69. On December 7, 2018, the new start date for Mary's Medicaid coverage was communicated to Select Specialty, as was the Plan's intent to retroactively terminate her Plan coverage to coincide with this new effective Medicaid date. *See* Docket 37-23. Wollman explained to Dakotacare that he wanted to wait until he "ha[d] the official letter from Medicaid stating her acceptance on [his] desk" before officially terminating Mary from the Plan.

4

Docket 48-8 at 1. On December 18, 2018, Wollman sent Mary's Plan termination form to Dakotacare. Docket 48-6 at 1.

On December 7, 2018, the same day Select Specialty learned of Mary's new Medicaid start date, a Select Specialty employee indicated that she would begin the process of submitting claims for Mary's care to Medicaid. Docket 37-23. On April 30, 2019, Emily Burnett, Select Specialty's Corporate Director of Managed Care, instructed other Select Specialty staff in an email to "hold off on seeking authorization from Medicaid." Docket 37-25 at 5. About half an hour later, she changed course, stating that Select Specialty should be seeking such authorization. *Id.* at 4. Select Specialty's Business Office Manager elaborated that they "are moving forward with [South Dakota Medicaid] in the event [they] are not successful" in obtaining reimbursement from Dakotacare. *Id.* Select Specialty sought retroactive authorization from Medicaid for all of Mary's care on May 2, 2019, which Medicaid approved on May 30, 2019. *Id.* at 1, 3.

The total charges incurred for Mary's treatment are $1,979,378.40. Docket 56 ¶ 36. Select Specialty claims that under the terms of the Participation Agreement, it is entitled to no less than $1,484,714.09 in compensation. *Id.* ¶ 37. Select Specialty accepted payment from Medicaid for Mary's care in the sum of $297,746.24. *Id.* ¶ 109.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden

by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### I. Brentwood's and the Fund's Motion for Summary Judgment and Select Specialty's Motion for Partial Summary Judgment

In their motion for summary judgment, Brentwood and the Fund argue that because Select Specialty accepted Medicaid reimbursement for the services it provided to Mary, it is barred under 42. C.F.R. § 447.15 from

6

seeking any additional compensation from third parties, including through this lawsuit. Docket 38 at 2; Docket 65 at 2.

### A. Claims Barred By 42 C.F.R. § 447.15

Medicaid is "a cooperative federal-state program in which the federal government provides funding to state programs that give medical assistance to people whose income and resources are insufficient to meet the costs of necessary medical services." *Iowa Dep't of Human Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 576 F.3d 885, 886 (8th Cir. 2009). A state that chooses to participate in Medicaid must operate its Medicaid program in conformity with federal regulations. *Id.* Likewise, health care providers are not required to participate in the Medicaid program, but if they do, they must also abide by federal Medicaid regulations. *See Robinett v. Shelby Cnty. Healthcare Corp.*, 895 F.3d 582, 587 (8th Cir. 2018).

At issue in this case is the proper interpretation of a federal regulation that states, in pertinent part: "A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, *as payment in full*, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual." 42 C.F.R. § 447.15 (emphasis added). Brentwood and the Fund argue that this regulation bars a provider from seeking any further payment for its services once it has accepted Medicaid payment for those services. Docket 38 at 7. Select Specialty argues that this regulation only limits a provider's ability to seek additional payment from the patient, and that providers remain

free to seek additional payment from third parties. Docket 54 at 10, 17. In interpreting a federal regulation, courts "begin[] with the regulation's plain language" and ask, "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

The court finds that the plain and unambiguous meaning of "payment in full" in 42 C.F.R. § 447.15 precludes providers from seeking any additional payment for services rendered from third parties once they have accepted Medicaid payment for those same services. *Lizer v. Eagle Air Med Corp.*, 308 F. Supp. 2d 1006, 1009 (D. Ariz. 2004) ("[T]he pertinent regulation clearly mandates that states must require providers to accept Medicaid payments as payment in full. This language prevents providers from billing *any* entity for the difference between their customary charge and the amount paid by Medicaid." (internal citation omitted)); *Gist v. Atlas Staffing, Inc.*, 910 N.W.2d 24, 31-32 (Minn. 2018) ("By its plain language, section 447.15 imposes a bright-line rule: when a provider . . . accepts Medicaid payment for . . . services, it accepts the amount paid as 'payment in full,' and thus cannot recover from third parties any unpaid amounts."); *Nickel v. Workers' Comp. Appeal Bd. (Agway Agronomy)*, 959 A.2d 498, 506 (Pa. Commw. Ct. 2008) ("The clear import of these words is that the Medicaid payment is the total amount owed to the provider for the services rendered, and thus the provider may not attempt to recover any additional amounts elsewhere."). Though the text of this regulation

8

carves out a limited exception for collecting certain cost sharing payments from patients, there is no similar exception for collecting reimbursement from health plans or other third parties. *See* 42 C.F.R. § 447.15 (". . . who accept, as payment in full, the amounts paid by [Medicaid] plus any deductible, coinsurance or copayment required by the plan to be paid by the individual.").

Though the Eighth Circuit has not directly considered the application of §447.15 to third parties, it has suggested that this regulation bars providers from seeking payment from them after being paid by Medicaid. *See Robinett*, 895 F.3d at 587 (allowing a hospital who had not accepted Medicaid to seek payment from Medicaid patient because "[u]nless and until a medical services provider . . . accept[s] payment from Medicaid, the provider is free to attempt to recover from the patient or a liable third party"). Of the three courts that have applied 42 C.F.R. § 447.15 to third parties, two have also concluded that additional payments are disallowed under this regulation. *Gist*, 910 N.W.2d at 31-33 (barring provider from seeking additional compensation from employer and employer's insurer after accepting Medicaid); *Nickel*, 959 A.2d at 507 (barring provider from seeking additional compensation from patient's employer after accepting Medicaid).

Select Specialty urges this court to apply the "better-reasoned analysis" of the only court to allow additional payments from third parties. Docket 54 at 15. But, other than a conclusory statement that "[§ 447.15] has no bearing on the contractual relationship" between the hospital and the insurer, that case

includes no analysis. *Montefiore Med. Ctr. v. Empire Healthchoice HMO, Inc.*, 191 A.D.3d 438, 439 (N.Y. App. Div. 2021).

Rather than engaging with the text of 42 C.F.R. § 447.15, Select Specialty focuses its attention on § 447.20, which states that, in certain circumstances, a provider "may not seek to collect from the individual (or any financially responsible relative or representative of that individual)." *See* Docket 54 at 14; 42 C.F.R. § 447.20. According to Select Specialty, this "federal regulation cannot reasonably be interpreted to bar a claim against an insurer" after a provider accepts Medicaid. Docket 54 at 14. But § 447.20 concerns what providers may seek to collect when they have determined there is third party liability for a Medicaid-eligible person's care, not about what they may collect after accepting Medicaid payments. *See* Medicaid Program; State Plan Requirements and Other Provisions Relating to State Third Party Liability Programs, 55 Fed. Reg. 1423-02, 1429 (Jan. 16, 1990) (discussing the difficulty for Medicaid agencies in monitoring and enforcing limits in § 447.20 because the provider has not billed Medicaid).

Select Specialty next relies on South Dakota Medicaid regulations to argue that this action is not barred by federal Medicaid regulations. Select Specialty points specifically to ARSD 67:16:26:08, which states, in pertinent part: "If [Medicaid] has made payments on behalf of a recipient, providers and recipients must reimburse [Medicaid] when a payment is received from a third-party liability source." Select Specialty argues that this provision "contemplates that a provider like Select Specialty may pursue a third-party liability source

10

like the Fund after receiving Medicaid payments." Docket 54 at 9. But ARSD 67:16:26:08 contemplates only that there are circumstances when a provider may receive payment from a third party after accepting Medicaid, not necessarily that it can pursue a third party for such payment. The second paragraph of ARSD 67:16:26:08 supports this distinction because this paragraph expressly contemplates an individual with Medicaid coverage pursuing third party liability, but does not reference providers. ARSD 67:16:26:08 ("If a [Medicaid] recipient employs an attorney to establish a third-party liability source . . . .").

Select Specialty also relies on ARSD 67:16:01:07, which, similar to 42 C.F.R. 447.15, provides that "[p]ayments under this article made on behalf of an eligible individual together with the individual's cost-sharing amount . . . are considered payment in full for medical services covered under the provisions of this article." Because this sentence of the regulation is followed by another that specifically prohibits making additional charges to "family, friends, political subdivisions, or the eligible individual," but not to third parties, Select Specialty claims that "neither the text nor purpose" of ARSD 67:16:01:07 precludes a provider from seeking payment from a third party after accepting Medicaid. Docket 54 at 14. But even if this court agreed with Select Specialty's interpretation of ARSD 67:16:01:07, it would conflict with the plain, unambiguous language of 42 C.F.R. 447.15, and the federal Medicaid regulation must control. *See Robinett*, 895 F.3d at 587 (state and providers must operate Medicaid programs in compliance with federal Medicaid

11

regulations); *see also Lizer*, 308 F. Supp. 2d at 1010 (holding state's health care provider lien statute preempted because it conflicted with 42 C.F.R. § 447.15).

Select Specialty's remaining argument is that barring health care providers from seeking additional payments from third parties after accepting Medicaid payment "would fatally undercut Medicaid's status as payor of last resort," and thus, "[u]nder the canons of statutory interpretation," the payment-in-full language "must be harmonized with the overarching imperative that Medicaid will not pay for medical services that are covered by private insurance." Docket 54 at 8; *see also* Docket 43-23 at 3 (acknowledging Medicaid as payor of last resort and obligating Select Specialty, as part of its agreement with Medicaid, to pursue liable third parties). Under Select Specialty's theory, if it and other providers are barred from seeking additional compensation after being paid by Medicaid, then "rogue insurer[s]" will be allowed to "shift the payment obligation to the American taxpayers." Docket 54 at 2.

But Medicaid is not without a remedy here if it determines that it should not have paid for Mary's care. In fact, the Medicaid statute expressly contemplates such a scenario, and when this occurs, state Medicaid agencies are required to seek reimbursement from a liable third party. *See* 42 U.S.C. § 1396a(a)(25)(A)-(B); 42 C.F.R. § 433.139(d)(2). This does not mean that health care providers must also be allowed to seek payment from third parties after accepting payment from Medicaid. *See Spectrum Health Continuing Care Grp. v.*

12

*Anna Marie Bowling Irrevocable Tr.*, 410 F.3d 304, 320 (6th Cir. 2005) ("Congress clearly envisioned a scenario in which a third party would be liable to a Medicaid beneficiary for medical services, but specifically authorized recovery only to the state agency."); *Evanston Hosp. v. Hauck*, 1 F.3d 540, 543 (7th Cir. 1993) ("The statute does not say anything about turning over this right of reimbursement to the hospitals and doctors who have already received some compensation for their services. Again, Congress' intent that state Medicaid agencies, not hospitals or doctors, seek reimbursement from third parties is evident . . . .").

Furthermore, allowing Select Specialty and other providers like it to seek additional compensation actually could undermine Medicaid's status as the payor of last resort. Under Select Specialty's approach, providers would not be incentivized to diligently pursue potentially liable third parties before accepting payment from Medicaid. Instead, they could bill and accept payment from Medicaid immediately, secure in their knowledge that they can get paid now without giving up the chance of a larger payment later if a liable third party is discovered. This would turn "Medicaid upside down by converting the system into an insurance program for hospitals, rather than for indigent patients." *Evanston Hosp.*, 1. F.3d at 544. Select Specialty did not have to accept payment from Medicaid for Mary's care, but because it did, its breach of contract action to recover the contracted rate for those services is barred. Thus, Select Specialty's motion for partial summary judgment on its breach of

13

contract claim against the Fund is denied, and Brentwood's and the Fund's motion for summary judgment on the breach of contract claim is granted.

Select Specialty also alleges unjust enrichment and quantum meruit against Brentwood and the Fund. Though the specific theories of these claims differ from breach of contract, at the heart of each is that Select Specialty is seeking payment for the services it provided to Mary and for which it has accepted Medicaid payment. Docket 25 ¶ 50 ("[Brentwood and the Fund] knowingly received the benefit of the provision of services to its members at a discounted rate pursuant to the terms of said Contract."); *id.* ¶ 56 "("The law of equity provides [Select Specialty] with a remedy and it is entitled to recover an amount equal to the value of the services provided based on the fee schedule in the Contract."). Thus, these claims are also barred by 42 C.F.R. § 447.15, and Brentwood's and the Fund's motion for summary judgment as to the unjust enrichment and quantum meruit claims is also granted.

### B. Select Specialty's Fraud and Deceit Claim Against Brentwood and the Fund

Brentwood and the Fund argue that 42 C.F.R. § 447.15 also bars Select Specialty's fraud and deceit claim. *See* Docket 65 at 2, 15. But the court does not read § 447.15 so broadly. Medicaid's payment is "payment in full" only for the services for which the provider accepted payment. *See* § 447.1 (describing purpose of subpart as establishing "requirements, . . . limitations, and procedures concerning payments made by State Medicaid agencies *for Medicaid services*." (emphasis added)). With the fraud and deceit claim, Select Specialty is not seeking additional payment for the actual services provided to Mary, but

14

rather is seeking damages stemming from Brentwood's and the Fund's allegedly deceitful acts. Docket 25 ¶¶ 68-81. There is nothing in the language of § 447.15 that indicates it was intended to preclude providers from seeking damages for a third party's allegedly tortious conduct just because that conduct is related to medical services for which it has accepted Medicaid. The only authority Brentwood and the Fund provide for their position is *All. Health of Santa Teresa, Inc. v. Nat'l Presto Indus., Inc.*, in which a health care provider was barred from pursing both its breach of contract and fraud claims. 173 P.3d 55 (N.M. Ct. App. 2007). But this case was decided under New Mexico Medicaid regulations and does not interpret, or even cite to, 42 C.F.R. § 447.15. *See id.* at 61-62. Thus, Select Specialty's fraud and deceit claim is not barred by 42 C.F.R. § 447.15.

Under South Dakota law, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL 20-10-1. "[R]eliance is a necessary element in proving an alleged fraud[.]" *Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120, 124 (S.D. 1977). Deceit means one of the following:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
>
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
>
> (4) A promise made without any intention of performing.

15

SDCL 20-10-2. These statutory provisions are "declaratory of the common law." *Mash v. Cutler*, 488 N.W.2d 642, 653 (S.D. 1992).

Select Specialty claims that the Fund acted deceptively in three ways. First, Select Specialty argues that Wollman's representation that Mary's coverage under the Plan had been retroactively terminated as of her Medicaid eligibility date "was false, inasmuch as the purported termination was not effective as a matter of law." Docket 54 at 22. Regardless of whether Mary's retroactive coverage termination was permissible, Select Specialty cannot show that it relied on the representation in making the decision to accept Medicaid payment for Mary's care. Internal emails of Select Specialty show that Select Specialty did not accept Medicaid out of reliance on the representation that Mary was terminated from the Plan. Instead, they show that Select Specialty pursued Medicaid payment to guarantee at least some payment as it continued to seek payment from the Fund under the terms of the Plan. Docket 37-25 at 2 ("[W]e are attempting to get authorization from [Medicaid] in order to secure some level of payment should the pursuit against [Dakotacare] fall short."); *see id.* at 4 ("We are moving forward with [Medicaid] in the event we are not successful with the attorney and [Dakotacare].").

Emails from Select Specialty's attorney to the Director of the Medicaid Fraud Control Unit in the South Dakota Attorney General's office also demonstrate that, shortly before it accepted Medicaid payment, it did not believe Mary's termination was permissible. *See* Docket 49-10 at 2 ("Since Medicaid is the payor of last resort it seems odd to me that payments would be

made without verification that the group policy, even if self insured, doesn't
cover this particular member. In our particular case the coverage was done
retroactively[,] which tells me there was either coverage or the potential for
coverage at the outset."); Docket 49-11 ("[T]here is a question as to whether one
of their members is covered under Medicaid . . . It is our belief that this should
be covered by a separate policy but we have been unable to verify this at
present. Nonetheless, in the event Medicaid does make this payment, we intend
to continue pursuing this if we find a legal basis exists for the same."). These
emails were sent on May 3, 2019, and May 30, 2019, respectively. Docket 49-
10 at 1; Docket 49-11 at 1. The Department of Social Services authorized the
Medicaid payment on May 30, 2019. Docket 56 ¶ 108. This payment, in the
amount of $297,746.24, was then accepted by Select Specialty in early summer
2019. Docket 37-6 at 8. Select Specialty points to no additional representations
from Brentwood or the Fund that it relied on in choosing to accept the
Medicaid payment between May 30, 2019, and the date it accepted the
Medicaid payment.

The second way the Fund allegedly acted deceptively is by "fail[ing] to
provide Select Specialty with a copy of the Plan documents, despite numerous
requests." Docket 54 at 21. Select Specialty claims this amounted to
suppression of the specific terms of the Plan, which would have shown that
Mary's retroactive termination was impermissible, and that the Fund had a
duty to disclose the terms of the Plan to Select Specialty. *See* SDCL 20-10-2(3).
To determine whether the Fund had a duty to disclose, the court must first

17

determine whether a fiduciary relationship existed between Select Specialty and the Fund. *See Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 499 (S.D. 1990) ("Cases where this court has found a duty to disclose have all involved an employment or fiduciary relationship."). "Fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit." *Id.* at 500. Here, nothing about the business relationship between the Fund and Select Specialty indicates the Fund was acting primarily for Select Specialty's benefit, so there is no fiduciary relationship.

Even absent a fiduciary relationship, there may be a duty to disclose "facts basic to [a] transaction" in certain circumstances. *See Lindskov v. Lindskov*, 800 N.W.2d 715, 719 (S.D. 2011). These circumstances are those "in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of community, and is so extreme and unfair, as to amount to a form of swindling[.]" *Schwartz v. Morgan*, 776 N.W.2d 827, 831 (S.D. 2009) (quoting Restatement (Second) Torts § 551(2)(e) (cmt l)). This is a "high standard," *Lindskov*, 800 N.W.2d at 720, and it is one that Select Specialty cannot meet. Select Specialty is experienced in the matters of billing and health insurance, likely much more experienced than Wollman, *see* Docket 43-2 at 6-7, and it had the assistance of counsel throughout, *see Lindskov*, 800 N.W.2d at 720 (no duty to disclose where parties had equal bargaining power, and both were represented by counsel regarding the relevant transaction). Thus, the Fund did not have a duty to disclose the specific terms of the Plan to Select

18

Specialty, and failure to produce the Plan documents does not qualify as deceit under SDCL 20-10-2(3).

The final way in which Select Specialty claims the Fund is liable for deceit is that it "made a promise without any intention of performing it for all care that was provided to Mary after the submission of the SSI-disability application on or about April 27, 2018." Docket 54 at 21 (internal quotation omitted). Select Specialty appears to allege that, via Dakotacare's coverage determination and preauthorization of services, the Fund promised to pay Select Specialty the contracted rate for Mary's care, and that at the time it did so, it had no intention of ever paying. *See* Docket 54 at 22 (". . . despite multiple prior representations by Dakotacare that she was a covered insured and that her care was medically necessary.").

But as Select Specialty itself has acknowledged, coverage verification and preauthorization were not a guarantee of payment. *See* Docket 60 ¶¶ 16-17; *see also* Docket 63-3 at 3 (verification of eligibility "shall not constitute a guarantee of payment," and defining preauthorization as a determination of "medical necessity"). The Participation Agreement between Select Specialty and Dakotacare expressly provides for situations where, after confirming coverage is in place for an individual, Dakotacare will later deny payment to the hospital because of new information regarding an individual's coverage at the time services were provided. *See* Docket 63-3 at 5. Thus, at the time the coverage and preauthorization determinations were made, Select Specialty knew that there was a possibility it would not be paid for some or all of the care under the

contracted rate. Select Specialty may think that Mary's termination from the plan was not permissible, but that does not transform the coverage and preauthorization determinations into promises to pay the contracted rate for the care. Thus, Brentwood's and the Fund's motion for summary judgment on the deceit claim is granted.

## II. Dakotacare's Motion for Summary Judgment

### A. Breach of Contract Claim

As an initial matter, Dakotacare argues in its motion for summary judgment that Select Specialty's breach of contract of claim against it is also barred under 42 C.F.R. § 447.15. But Select Specialty is not alleging that Dakotacare breached the contract by not paying Select Specialty for the services provided to Mary and for which Select Specialty was paid by Medicaid. Instead, Select Specialty alleges that Dakotacare breached the contract by (1) not adequately assisting Select Specialty in ensuring payment by the Fund, and (2) violating its duty to preauthorize services in good faith. Docket 25 ¶¶ 43-44. These claims are not barred by § 447.15 because "payment in full" in this provision applies only to the services for which the provider accepted payment from Medicaid. *See* § 447.1 (describing purpose of subpart as establishing "requirements, . . . limitations, and procedures concerning payments made by State Medicaid agencies for Medicaid services").

Select Specialty alleges that Dakotacare breached Article XVI.D, which provides that "Dakotacare shall encourage [the Fund] to adhere to all terms of this Agreement including, but not limited to, prompt payment of claims and

20

appropriate reimbursement. Dakotacare shall assist [Select Specialty] with follow up on issues [Select Specialty] has with [the Fund]." Docket 63-3 at 10. According to Select Specialty, had Dakotacare not breached this provision, "Select Specialty would have been paid for covered services it rendered at the contractual rate." Docket 61 at 13. Select Specialty specifically claims that Dakotacare "worked directly with the Fund and provided advice and counsel in how to avoid 'prompt payment of claims.'" *Id.* But Select Specialty has produced no evidence that Dakotacare provided any "advice and counsel" to the Fund relating to obtaining Medicaid coverage for Mary or retroactively terminating Mary's coverage under the Plan. In fact, Wollman testified that he asked Thompson about the interaction between Medicaid eligibility and Plan coverage, but that she did not give an answer because she did not know the answer and because she could not provide one as a matter of Dakotacare's policy. Docket 43-2 at 5; *see also* Docket 43-9 (Thompson explained that no one from Dakotacare was involved in Mary's application for Medicaid and it is Dakotacare's policy to not assist in obtaining government assistance or to provide advice about government assistance). Wollman explained that it was information from Mary's primary care providers, not Dakotacare, that led him to seek retroactive Medicaid eligibility for Mary. Docket 43-2 at 6-7.

Select Specialty also alleges that had Dakotacare "simply followed [the Fund's] directive" on October 16, 2018, to terminate Mary's Plan coverage effective April 30, 2018, then at least Mary's most expensive stay at Select Specialty would have been paid for at the contractual rate. Docket 61 at 15.

But this confuses the timeline. The directive to terminate Mary's coverage effective April 30, 2018, was sent by the Fund to Dakotacare on October 10, not October 16. Docket 37-19. On October 10, Select Specialty had not yet sent any claims to Dakotacare for Mary's care, so there was no payment for Dakotacare to "hold back." Dakotacare received the first claim for Mary's care on October 15, 2018. Docket 43-9 at 3-4. The next day, the Fund informed Select Specialty that it was waiting to learn the effective date of Mary's retroactive Medicaid coverage and then would be terminating Mary's Plan coverage to coincide with when Medicaid coverage would "take over." Docket 43-17 at 1. Also on October 16, 2018, the Fund directed Dakotacare to not pay any claims from Select Specialty pending resolution of Medicaid's effective date. Docket 43-9 at 3-4. Thus, even viewing the facts in the light most favorable to Select Specialty, there was never any opportunity for Dakotacare to delay or withhold payments.

Select Specialty also argues that Dakotacare breached the implied covenant of good faith and fair dealing in its eligibility determinations. Docket 61 at 18-19; Docket 25 ¶ 43-44. Select Specialty argues (1) Dakotacare had advance knowledge of the Fund's intention of not paying Mary's claims by retroactively terminating Mary from Plan coverage and kept this from Select Specialty, and (2) Dakotacare knew the Fund's justification for terminating Mary was disallowed by the Plan documents but issued retroactive eligibility denials anyway. *See id.* As to the first argument, Select Specialty has produced no evidence that Dakotacare knew of the Fund's plan to retroactively terminate

Mary's coverage prior to October 10, 2018, which is less than a week before the Fund also informed Select Specialty of this intention. Docket 37-19; Docket 43-17 at 1. For the second argument, Select Specialty claims that, because Dakotacare had access to the Plan documents, it knew "that the stated basis for retroactive termination, [Medicaid eligibility], was a fiction and . . . contrary to the Plan documents," but it issued retroactive eligibility denials anyway. Docket 61 at 19.

"Every contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Garrett v. Bankwest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990). Generally, good faith means "honesty in fact in the conduct or transaction concerned," but its application will "var[y] with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (first quotation quoting SDCL 57A-1-201(19)).

Here, the Participation Agreement requires Dakotacare to make eligibility determinations in "good faith." Docket 63-3 at 3. But it also specifies that verification of eligibility "shall not constitute a guarantee of payment," and that if Dakotacare "retrospectively determines the services rendered to a Member were inappropriate due to Member eligibility at the time of service, Dakotacare may elect to deny payment." Docket 63-3 at 3, 5. The Plan documents specify that the Plan Sponsor "ha[s] the authority to resolve all questions relating to participation and coverage under [the] Plan, including . . . questions

concerning eligibility, dates of participation, coverage, and enrollment." Docket 49-1 ¶ 10.01. The Summary Plan Description gives the Plan Administrator the "sole authority and responsibility to review and make a final decision on all claims to benefit" under the Plan, and it expressly contemplates retroactive terminations of coverage. Docket 37-2 at 4, 37. Section IV of the Summary Plan Description also states that all Colony members "in good standing with the Church elders will be covered . . . until the [member] leaves the Colony, turns age 65," or dies. *Id.* at 12.

Select Specialty places great emphasis on Section IV of the Summary Plan Description, arguing that Medicaid eligibility is not one of the listed reasons for termination of coverage. *See* Docket 61 at 19; Docket 64 at 7. But the authority to interpret that provision and make final decisions regarding eligibility lies with the Plan Administrator, not with Dakotacare. *See* Docket 49-1 ¶ 10.01; Docket 37-2 at 4. Under that authority, the Plan, through Wollman, directed Dakotacare to retroactively terminate Mary's coverage. Docket 37-19. There is nothing dishonest about Dakotacare carrying out that directive, and because the Participation Agreement between Select Specialty and Dakotacare expressly contemplated retroactive denials that could result in nonpayment, Docket 63-3 at 3, 5, this action was also "consisten[t] with the justified expectations of the [parties]," *Garrett*, 459 N.W.2d at 841. Thus, Dakotacare did not breach the implied covenant of good faith and fair dealing when it followed the Plan's directive to terminate Marys' coverage, and Dakotacare's motion for summary judgment as to the breach of contract claim is granted.

24

### B. Unjust Enrichment Claim

Dakotacare also moves for summary judgment on Select Specialty's unjust enrichment claim against it, and it argues that Select Specialty has waived this claim because it failed to address this basis for summary judgment in its brief in opposition. Docket 42 at 18; Docket 67 at 20.

"Failure to oppose a basis for summary judgment constitutes a waiver of that argument." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009). In its brief in opposition, Select Specialty acknowledges that Dakotacare has moved for summary judgment on the "breach of contract/unjust enrichment" claim, and it contends that this claim is "actionable and supported with competent evidence." Docket 61 at 13. But there is no other mention of unjust enrichment in Select Specialty's brief. The brief devotes several pages to the alleged breach of contract, but the elements for breach of contract and unjust enrichment are not the same. *See Johnson v. Larson*, 779 N.W.2d 412, 416-17 (S.D. 2010) (unjust enrichment requires the liable party to have received a benefit, to be aware he received that benefit, and for it to be "inequitable to allow [the liable party] to retain the benefit without paying for it"). As the party opposing the motion for summary judgment, Select Specialty must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). It has not done so on the unjust enrichment claim against Dakotacare. Thus, Dakotacare's motion for summary judgment on this claim is granted.

**C. Negligence Claim**

Dakotacare argues that the court should grant summary judgment on Select Specialty's negligence claim because "[t]he [e]xistence of the [e]xpress [c]ontract [b]ars" such a claim. Docket 42 at 19. Under South Dakota law, "[t]ort liability requires 'a breach of a legal duty independent of contract.'" *Schipporeit v. Khan*, 775 N.W.2d 503, 505 (S.D. 2009) (quoting *Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493, 500 (S.D. 1997)). Although this independent legal duty can be related to the parties' contract, it must "involve[] more than the elements, i.e. terms of the contract, and [be] based . . . on the nature of the on-going relationship between the parties." *Id.* at 506.

The crux of Select Specialty's negligence claim is its allegation that Dakotacare did not exercise due care in making eligibility determinations and communicating about those determinations with Select Specialty. *See* Docket 25 ¶¶ 59-61; Docket 61 at 21-22. But eligibility determinations are a term of the Participation Agreement. The Agreement requires Select Specialty to contact Dakotacare to verify eligibility when a patient presents a Dakotacare card, and Dakotacare must make eligibility verifications in good faith. Docket 63-3 at 3. The Agreement also specifies that verification of eligibility is not a guarantee of payment, and that Dakotacare may "retrospectively determine[] the services provided to a Member were inappropriate due to Member eligibility at the time of service." *Id.* at 3, 5. Thus, there is no independent legal duty here to support Select Specialty's negligence claim, which Select Specialty itself admits in the amended complaint. Docket 25 ¶ 60 ("Dakotacare had a duty to

26

[Select Specialty] by virtue of the Contract to exercise due care in getting approvals and ensuring payment to [Select Specialty] for the provision of Medically Necessary Covered Services."). Summary judgment is granted in favor of Dakotacare on the negligence claim.[1]

### III. Civil Conspiracy Claim Against All Defendants

Select Specialty argues that the court should not grant summary judgment on its conspiracy claim against all defendants because a "jury could determine that the Fund committed fraud and deceit, and that Dakotacare aided and abetted or conspired to participate in that fraud and deceit." Docket 61 at 31. Civil conspiracy "is not an independent cause of action, but is sustainable only after an underlying tort claim has been established." *Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008) (cleaned up). Here, the court has granted summary judgment in favor of the defendants on Select Specialty's fraud and deceit claim, so there is no underlying tort on which a civil conspiracy claim can be based.

Select Specialty disagrees, relying on *Huether v. Mihm Transportation Co.*, in which the South Dakota Supreme Court explained that the "jury could have found the underlying tort to be something other than" the only torts established in that case. 857 N.W.2d 854, 861-62 (S.D. 2014). Thus, Select

---

[1] In its Brief in Opposition to Dakotacare's Motion for Summary Judgment, Select Specialty argues—for the first time—that Dakotacare is also liable under a theory of negligence per se. Docket 61 at 23-24. Because this claim was not included in plaintiff's Amended Complaint, the court will not consider it. *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (Parties may not "manufacture claims, which were not pled, late into litigation for the purpose of avoiding summary judgment.").

Specialty argues, "it is up to the jury to decide what underlying tort is the predicate tort for a civil conspiracy claim." Docket 61 at 31. But in *Huether*, the jury heard evidence that could have established another predicate tort, though the verdict form did not ask the jury to specify that it had. *See* 857 N.W.2d at 861-62 & n.4. Here, the only tort that Select Specialty alleges and that it has attempted to establish via competent evidence is its deceit claim. To survive summary judgment, Select Specialty must do more than "rest on mere allegations" and "must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley*, 415 F.3d at 910 (quoting *Krenik*, 47 F.3d at 957). Because Select Specialty cannot demonstrate on the record the existence of specific facts that support another predicate tort, or even specify which other predicate tort could be established, summary judgment is granted in favor of the defendants on the civil conspiracy claim.

## IV. Select Specialty's Request for Declaratory Relief

In its Amended Complaint, Select Specialty asserts that Mary "executed agreements that . . . assigned to [it] certain rights that were afforded to her under the terms of the Plan." Docket 25 ¶ 86. Accordingly, Select Specialty seeks a declaratory judgment holding (1) that it has standing to assert Mary's rights under Plan, including for wrongful termination; (2) that Mary's termination from the Plan was "contrary to law and otherwise void and ineffective;" and (3) as Mary's assignee, Select Specialty "is entitled to require the Plan [to] pay out benefits in accordance with its terms for services that were preauthorized." *Id.* at 13. Brentwood and the Fund only make a cursory,

indirect reference to Select Specialty's claim for declaratory relief, and they do so only in their reply brief. *See Winterboer v. Edgewood Sioux Falls Senior Living, LLC*, 12-CV-4049-KES, 2014 WL 28863, at *4 n.1 (D.S.D. Jan. 2, 2014) ("Arguments raised for the first time in reply briefs should not be considered because the opposing party has had no opportunity to respond." (citing *Johnson v. Berry*, 171 F. Supp. 2d 985, 990 n.3 (E.D. Mo. 2001))). Thus, the court denies Brentwood's and the Fund's motion for summary judgment as to Select Specialty's claim for declaratory relief.

## CONCLUSION

Because Select Specialty's breach of contract, unjust enrichment, and quantum meruit claims against Brentwood and the Fund are barred as a matter of law, Brentwood's and the Fund's motion for summary judgment on those claims are granted, and Select Specialty's motion for partial summary judgment is denied. Brentwood's and the Fund's motion for summary judgment is also granted as to the fraud and deceit and civil conspiracy claims because Select Specialty cannot establish the elements of the fraud and deceit claim and there is no predicate tort for the civil conspiracy claim. Brentwood's and the Fund's motion for summary judgment as to Select Specialty's request for declaratory relief is denied. Dakotacare's motion for summary judgment is granted in full because Select Specialty cannot establish the elements of its breach of contract, unjust enrichment, and negligence claims, and because there is no predicate tort for the civil conspiracy claim. Thus, it is

ORDERED that Brentwood's and the Fund's motion for summary judgment (Docket 35) is granted as to all claims except for declaratory relief, for which the motion is denied.

IT IS FURTHER ORDERED that Dakotacare's motion for summary judgment (Docket 40) is granted.

IT IS FURTHER ORDERED that Select Specialty's motion for partial summary judgment (Docket 44) is denied.

Dated December 28, 2021.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE